```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
UNITED STATES OF AMERICA                :
                                        :       ORDER DENYING
        -against-                       :       DEFENDANT'S MOTION
                                        :       TO SUPPRESS
PARVINDER DOSANJH,                      :
                                        :       08 Cr. 211 (AKH)
                        Defendant.      :
---------------------------------------------------------------- x
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

Defendant Parvinder Dosanjh is charged in an indictment filed March 12, 2008 with conspiracy to distribute narcotics in violation of 21 U.S.C. § 846, conspiracy to import narcotics in violation of 21 U.S.C. § 963, and conspiracy to launder money in violation of 18 U.S.C. § 1956. Defendant moves to suppress statements that she made to federal agents after receiving Miranda warnings. I held an evidentiary hearing on the motion on November 6, 2008. For the reasons discussed below, the motion is denied.

**I. Facts**

On April 8, 2008, around 7:30 p.m., federal agents arrested Defendant on the sidewalk outside her apartment in Santa Monica, California. The agents approached Defendant as she was walking with her boyfriend, Matthew Muzio, from the apartment to a nearby alley where his car was parked. The couple was about to drive to a restaurant for dinner. Defendant, who had smoked a marijuana cigarette before leaving, wore high heels and an evening dress, a "very high" miniskirt. (Tr. 7:17-8:13; 22:15-17; 77:19-79:10; 105:7-106:9.).

The agents told Defendant that they were executing an arrest warrant issued by this Court, the United States District Court for the Southern District of New York, pursuant to the indictment identified above. They separated Defendant and Muzio, placing them about 15 feet apart. I.R.S. Special Agent Philip Cousin asked Defendant if she remembered him from his

1

interview of her in 2005 as part of a drug trafficking investigation.  She said that she did not.  Cousin then told Defendant that she was being placed under arrest, showed her a copy of the arrest warrant, and explained the charges against her.  (Tr. 11:20-12:17; 78:19-79:10; 105:7-18.).

Defendant testified that she promptly asked for a lawyer, even before hearing Miranda warnings.  Muzio testified that he shouted to Defendant not to speak to the agents without a lawyer.  However, Cousin and Deputy U.S. Marshal Paul Kracht testified that they did not hear either statement, thus disputing Defendant's and Muzio's assertions.  (Tr. 15:19-16:5; 61:17-62:3; 79:11-80:15; 97:8-99:4; 106:13-107:23.).

What is clear is that Defendant wanted very much to change into more comfortable and appropriate clothes for her detention, and asked Cousin to take her back to her apartment for that purpose.  She testified, "I told the officer that I had no idea what he was talking about and that I wanted to see a lawyer and I wanted to go change my attire."  (Tr. 79:12-15.).  Cousin agreed to allow Defendant to return to the apartment to change at least her shoes.  He began to recite the Miranda rights to Defendant, but she asked him not to do so on the sidewalk.  As she testified, "I was quite nervous about the fact of what was going on and I didn't want my neighbors to know, so I told him when we get to the apartment let's make it happen over there."  Kracht also testified that Defendant wanted to continue the arrest nearer to her apartment because she felt embarrassed.  (Tr. 12:18-13:12; 59:17-60:19; 79:11-81:6.).

Cousin, Kracht, and Defendant climbed an open-air stairwell to Defendant's second-floor apartment.  Standing outside her door, Cousin recited the Miranda rights to Defendant.  He testified that he "asked her if she understood them and she said yes," and Kracht testified that she said "something to the effect of that's fine, I understand."  (Tr. 17:5-22; 60:20-61:2; 81:9-82:2; 95:10-96:2.).  Defendant went inside to change, sat at the kitchen table with the

2

two agents, and consented to a search of the apartment.  The agents moved her handcuffs from behind her body to the front, and other agents, all male, entered the apartment.  (Tr. 34:7-8; 65:18-66:18.).

At first, Cousin sat at the table across from Defendant and suggested that she remove her jewelry before leaving with the agents for detention.  (Tr. 18:10-18.).  He then engaged Defendant in conversation.  He commented that she was in serious trouble.  He said that the agents knew that she had retrieved large bags of marijuana at the U.S.-Canada border, that she delivered those bags to others in exchange for bags of money, that she delivered the bags of money to different people, and that she apparently was involved in an organization that carried out these activities.  (Tr. 84:12-85:16.).  As Cousin testified, "I did tell her that I felt she was involved in marijuana distribution" and that her activities had hurt people.  (Tr. 47:10-24.).  Defendant testified that Cousin's tone and body language were aggressive, though she did not feel physically threatened.  Cousin testified that he was standing "most of the time" while speaking to Defendant, and Kracht testified that Cousin "leaned down" to ask her questions, but Cousin denied that he had spoken or had acted aggressively.  (Tr. 43:9-16; 63:4-6.).

Cousin testified that Defendant, in response to his comments and questions, said that she had picked up "large duffel bags" of marijuana at the Canadian border "a number of times," that the marijuana was used for medical purposes, and "that she didn't think it was so bad because it was only weed," which is "like a gift from God [and] not such a bad thing."  He testified that Defendant said that she also picked up "knapsacks or gym bags," which she assumed were filled with money to buy more marijuana, and that she did not know from whom she retrieved the bags or to whom she delivered them.  Cousin further testified that Defendant said, "I don't work for those people anymore," and, "I know it was illegal but I really didn't

3

think it was a big deal, it's just marijuana." (Tr. 18:19-21:18; 40:16-43:17; 47:10-24; 82:15-85:17; 88:20-90:24; 97:8.).

After her conversation with Cousin, Defendant consented to agents searching her cell phone or BlackBerry, and asked to speak to Muzio to tell him to call a lawyer for her. Cousin asked no more questions and made no more comments. He escorted Defendant, who had changed into a blazer and pants, back to the street. About 20 minutes had passed since they had entered her apartment. (Tr. 21:19-23:1; 108:4-9.).

## II. Discussion

In Miranda v. Arizona, the Supreme Court held that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 473-74 (1966). Because of these pressures, the Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination" guaranteed by the Fifth Amendment to the U.S. Constitution. Id. at 444. These safeguards are established if the police administer Miranda warnings that inform the suspect of his constitutional rights, and the suspect "waive[s] effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id.

"To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam) (citing Moran v. Burbine, 475 U.S. 412 (1986)). The

Government must prove a valid waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Accordingly, "courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373 (1979); see United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990).

Defendant argues (1) that she did not waive her Miranda rights before Cousin questioned her, as Miranda requires; and (2) that if she did waive her Miranda rights, her waiver was not voluntary, knowing, and intelligent because she was under the influence of marijuana. It is undisputed that Defendant made the statements in question while in custody and in response to interrogation. Therefore, I must determine whether the Government has shown, by a preponderance of the evidence, that Defendant in fact validly had waived her Miranda rights.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). In the Miranda context, "the question of waiver must be determined on 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" Butler, 441 U.S. at 374 (quoting Zerbst, 304 U.S. at 464); see Fare v. Michael C., 442 U.S. 707, 725 (1979) (requiring "inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel"). A suspect's waiver of Miranda rights may be express or implied, since "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." Butler, 441 U.S. at 373 (holding that courts may infer waiver from "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver"). However, though a waiver may be implied, the Miranda Court

5

cautioned that "a valid waiver will not be presumed . . . simply from the fact that a confession was in fact eventually obtained."  384 U.S. at 475; see Scarpa, 897 F.2d at 68.

   The testimony at the evidentiary hearing conflicted sharply on the points most relevant to Defendant's motion, presenting questions of credibility that I must resolve.  See United States v. Gaines, 295 F.3d 293, 298 (2d Cir. 2002).  I find that Defendant did not ask for a lawyer at any time before Cousin questioned her, either on the sidewalk or just after entering the apartment, and that Cousin ended his interrogation when she did ask for a lawyer.  I further find that Defendant did not indicate on the sidewalk that she "had nothing to say" to Cousin, either directly or by responding to any statement by Muzio.  Defendant's primary interest was to persuade the federal agents to allow her to return to her apartment in order to change her clothes and shoes to attire that would be more appropriate, and more comfortable, for a stay in police detention, and she was unwilling to do or say anything that might jeopardize her ability to get back to her apartment.  Specifically, she did not want to do anything that might anger Cousin or cause him not to allow her to reenter her apartment and change her clothes.

   The principal conflict concerns how to understand what happened when Defendant, Cousin, and Kracht came to her apartment.  Cousin testified that he asked Defendant, in the stairwell, whether she would like to talk, and that she answered, "We can talk upstairs in my apartment," or "Yes, but could we talk upstairs?"  (Tr. 17:23-18:9; 38:19-39:23.).  Defendant testified that Cousin asked whether she either understood or wanted to waive her rights, and that she responded that she had nothing to say and wanted only to enter the apartment to change her shoes.  Kracht, who was standing with Cousin and Defendant, did not confirm that exchange or much of anything that was said, either according to Defendant or according to Cousin.  No agent

6

asked Defendant to sign a written waiver of her Miranda rights. (Tr. 40:1-10; 82:7-14; 96:4-97:6.).

I find that Defendant, an educated and articulate small business owner, knew that she did not have to speak to the agents or agree to speak to them, but that she hoped to maintain an appearance of cooperativeness to induce Cousin to move out of sight of neighbors, and to allow her to change her shoes and clothes before leaving with the agents for detention. She knew and understood her Miranda rights, but stopped short of clearly indicating that knowledge and understanding to Cousin. Because Cousin understood her ambivalence, he refrained from asking her to confirm such understanding in writing.

I find that before Cousin spoke to Defendant about the serious evidence inculpating her in narcotics trafficking in New York, and before Defendant responded with statements that the prosecution may seek to introduce into evidence as an implied admission, there was not an express waiver of Miranda rights. Defendant did not clearly state to Cousin that she would speak to him inside her apartment. Cousin may so have believed, and Defendant may have contributed to that belief, but Cousin failed to secure a clear expression of Defendant's intent to waive her constitutional rights.

The issue is whether there was an implied waiver by Defendant of her Miranda right not to respond to Cousin's comments and questions. Cousin described Defendant's serious and harmful trafficking of bags filled with drug money and marijuana precisely to evoke a response from Defendant, and Defendant bit the bait. Defendant understood her rights, but nevertheless responded to Cousin's comments and questions. See Scarpa, 897 F.2d at 67-68 (finding implied waiver where "self-confident defendant who knew whether and when he wanted an attorney" nonetheless engaged in "relaxed and friendly" conversation with agents); United

7

States v. Silva, 715 F.2d 43, 49 (1983).  Defendant argues that the agents were aggressive, but I find that they were not.  It is not clear whether, at the time of the conversation, there were additional agents in the apartment conducting the search to which Defendant had consented, but I find that Cousin was polite at all times.

If a suspect, knowing that she is not compelled to speak, is moved to do so to correct something that an agent has said, or to put it in a different and less harsh light, or to clarify or dispute the gravity of culpability that an agent has depicted, without beforehand expressly waiving her Miranda rights, has Miranda been violated?  Defendant would argue that it has, that an unclear or equivocal statement or course of conduct cannot constitute an "intentional relinquishment or abandonment of a known right or privilege," Zerbst, 304 U.S. at 464, that a waiver must be unambiguous, even if implied, see Black's Law Dictionary 1611 (8th ed. 2004) (defining "implied waiver" as a "waiver evidenced by a party's *decisive, unequivocal* conduct reasonably inferring the intent to waive" (emphasis added)), and that a court must "indulge in every reasonable presumption against waiver of fundamental constitutional rights," not read waiver into a cloudy record.  Michigan v. Jackson, 475 U.S. 625, 633 (1986) (quoting Brewer v. Williams, 430 U.S. 387, 440 (1977)); see United States v. Johnson, 400 F.3d 187, 196-97 (4th Cir. 2005) (resolving ambiguity in defendant's markings on waiver form against waiver of Miranda rights).

Nevertheless, even in light of these authorities, and even though "[d]oubts must be resolved in favor of protecting the constitutional claim," Jackson, 475 U.S. at 633, I conclude that the Government has proved by a preponderance of the evidence that Defendant waived her Miranda rights by choosing to speak when she knew that she could keep silent and that her silence could not be used against her.  See Silva, 715 F.2d at 49 (finding implied waiver where

8

Defendant understood <u>Miranda</u> warnings and answered all questions posed without hesitation). Considering the totality of the circumstances, Defendant engaged in a course of conduct indicating waiver, because, understanding her rights, she responded freely to civil questioning, while also consenting to searches of her apartment and phone. See <u>Butler</u>, 441 U.S. at 373-74. Defendant made a choice, and that, at bottom, is all that <u>Miranda</u> requires—that the autonomy of the individual not be intimidated, or coerced, or compromised by ignorance. Agent Cousin did not intimidate, or coerce, or take advantage of ignorance. Defendant spoke because she was moved to speak, through her own volition, and not because of fear, or duress, or unawareness. She may regret her speech, but that is not a <u>Miranda</u> issue. And her speech may not be an admission, but that is a different question, which I need not now decide.

### III. Conclusion

Defendant's motion to suppress is denied. The Clerk shall mark the motion (Doc. #15) as terminated. The parties shall appear on January 23, 2009, at 11:00 a.m., to discuss the next stage in this proceeding, probably a trial date.

SO ORDERED.

Dated:       December _10_, 2008
             New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge